IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

TRIPOLI MANAGEMENT, LLC,
d/b/a DWIRE EARTHMOVING
AND EXCAVATING, INC.,

        Plaintiff,

   Vs.                         No.  10-1062-SAC

WASTE CONNECTIONS OF
KANSAS, INC.,

        Defendant.

MEMORANDUM AND ORDER

This case is primarily a contract dispute over the construction of a landfill cell in Harper County, Kansas.  This order will address the following motions that are fully briefed and ripe for decision:   Defendant Waste Connections of Kansas, ("WCK") Inc.'s motion for partial summary judgment on liability against certain claims asserted by the Plaintiff Tripoli Management, LLC d/b/a Dwire Earthmoving and Excavating ("Dwire") (Dk. 55); Dwire's motion to sever WCK's counterclaims in negligence (Dk. 67); WCK's motion for partial summary judgment on its counterclaims (Dk. 96); and Dwire's motion for partial summary judgment on WCK's counterclaim in negligence (Dk. 98).

*Summary Judgment Standards*

Rule 56 authorizes judgment without trial "if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). Substantive law governs the elements of a given claim or defense and reveals what issues are to be determined and what facts are material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is one which would affect the outcome of the claim or defense under the governing law. *Id.* If the movant would not have the burden of proof at trial on the particular claim or defense, then the motion must point to the absence of a genuine issue of material fact. Instead of disproving a claim or defense, the movant need only show "a lack of evidence" on an essential element. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). To counter a "properly made" motion, the non-movant must come forward with specific facts based on admissible evidence. *Id.* The non-movant must show more than some "metaphysical doubt" based on "evidence" and not "speculation, conjecture or surmise." *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Bones v. Honeywell Intern.*, 366 F.3d 869, 875 (10th Cir. 2004). "[T]he dispute about a material fact is 'genuine,' . . ., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the nonmoving

2

party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Anderson*, 477 U.S. at 255.  Facts and reasonable inferences therefrom are to be viewed in the light most favorable to the nonmoving party. *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1273 (10th Cir.2005).  At this stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . . " *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.  *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir.2009).

**WCK'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY ON CERTAIN CLAIMS BY DWIRE (Dk. 55)**

Dwire asserts claims for costs allegedly due under the contract for work done.  These claims are of three kinds: (1) additional costs for hauling more excavated material a longer distance, (2) compensation for additional quantities of material actually excavated,  and (3) "time and material" billing for removal of water and mud from excavation site and for extra "rain flap" work.  The following are the uncontroverted facts relevant to the summary judgment issues raised against these claims.

WCK solicited bids for excavation of a new disposal cell ("Cell 5C") at its Plumb Thicket Landfill in Harper, Kansas.  On February 6, 2009,

bidders attended a mandatory pre-bid meeting and site visit of the landfill. Dwire, an earthmoving and excavating company located in Colorado Springs, Colorado, was a bidder.  Approximately a year earlier, Dwire contracted for and performed excavation work on a landfill in Pueblo, Colorado, for Waste Connections of Colorado.  Dwire worked on this Colorado project with Brian Karp, the Central Region Engineer for Waste Connections, Inc..  Brian Karp served in an administrative capacity on WCK's project at Plumb Thicket.

On February 19, 2009, Dwire emailed Brian Karp about the Plumb Thicket bid asking in part:  "Is there a limit to the height or size of the overburden stockpile, or any other stockpile for this job?"  (Dk. 56, Ex. 16).  Karp replied to this inquiry with an email addressed to all bidders: "The material that is being excavated from the cell will be placed in the draw that is directly west of the cell (approx 0.25 mile haul at most) and will be used to create a haul road to access the cell.  The draw should hold the majority of the material and the remainder can be stockpiled."  *Id.*  Dwire relied on this information in preparing its bid with lower hauling costs.

Dwire successfully bid on the project.  Before executing the contract, Dwire received from Aquaterra Environmental Solutions, Inc. ("Aquaterra"), the "Engineer" identified in the contract, a complete copy of the Project Manual that included:  "the Scope of Work, the Technical Specifications, the draft Contract, General Conditions associated with the

4

project, the Supplemental Conditions associated with the project, and Construction Drawings for the project." (Dk. 56, p. 4).

Dwire's work at the site began March 8, 2009. Within days, WCK directed Dwire to stop unloading excavated soil in the draw immediately to the west of the excavation site and to take the material instead a longer distance from the site to a stockpile. In order to meet this demand and maintain its targeted work schedule, Dwire had to make longer trips and cycle times for unloading the excavated material and had to increase the number of its haul units. So five days after starting work, Dwire submitted to WCK a request for a change order caused by a "change in conditions due to export placement." (Dk. 56, Ex. 6). The request explained:

> Prior to bid, we were directed to export most of the cell material to the draw to the West of the cell, and take the remaining material to the stockpile location. Filling the draws provided a cheap, quick, downhill haul method of placing the exported material. If the draws are not available to receive the fill, the majority of the export material will have to go to the stockpile location. To maintain production and schedule we will need to add 3 haul units and a full time D-9 to be able to work in a restricted area, and complete an uphill haul. We consider this a change in conditions and are requesting an additional $.63 per cy for item #4, and an additional $16,622.00 to mobilize 3 haul units.

*Id.* The change order's total request was $178,273.70. Dwire did not notify the contract's engineer, Aquaterra, of this asserted change in conditions or make a request for action from it. Acting on behalf of WCK, Brian Karp

denied the change order request.  Despite the denial, Dwire continued the excavation work hauling the excavated material a longer distance.  Dwire communicated with Karp about the distance and additional costs, and Karp said he would try to shorten the hauling routes and find closer locations for unloading.  Dwire submitted its first application for payment dated March 25, 2009, requesting a payment due of $493,837.31.  This application did not include or mention any change orders.

With regard to excavation quantities, Dwire exchanged emails with Karp between April 20 and 22 about the differences in quantities between what Dwire had actually excavated and what it had bid.  Additional emails exchanged on April 23 discuss survey data provided to Dwire that its takeoff to be less than the quantities Dwire estimated in the contract.  Later on the afternoon of April 23, Dwire submitted its third pay application to Aquaterra that calculated excavation quantities "based on surveys as verified by . . . load counts." (Dk. 56, Ex. 10 at p. 1).  The email requested that, "[i]n the event your preliminary determination yields a number different from that which we have proposed, pursuant to paragraph 9.07, we request that you review with us your preliminary determination of any quantity so that we may obtain a timely decision, processing, and approval of our payment application #3." *Id.*  This pay application requested payment on a "change order #4" for an additional 39,716 cu. yards of excavated material.

6

*Id.* at p. 5.  WCK denied this attempted change order.  With regards to this

pay application, Matt Crockett, the Project Manager for Aquaterra, emailed

Dwire noting that the Engineer lacked authority to approve change orders

and that:

> Second, as stated in the Scope of Work, Measurement and Payment
> Section, payment shall be based on completed excavation cubic yards
> substantiated by survey data.  I have requested the Subgrade
> Certification Survey that was completed by Garber to compare with the
> Preconstruction survey to verify the quantities.  I will not receive the
> survey until Monday.

(Dk. 56, Ex. 11).

On the subject of leachate, Dwire emailed Glenn Swaggart of

Weaver Boos Consultants, LLC ("Weaver Boos") on or about May 19, 2009.

WCK had retained Weaver Boos as the Construction Quality Assurance

engineer for the project.  Dwire's email notified Swaggart that water was

coming into the work area and it could be leachate coming from the existing

liner or ground water.  Swaggart replied with an email expressing that he

understood leachate had "been allowed to leak into the new cell area," that

he believed the leachate was caused by Dwire's construction methods

around the rain flap and liner, and that Dwire was responsible under the

contract for compliant handling of the leachate.  Dwire continued its work

and did not notify WCK that it would submit a change order based on time

and material billing for handling the leachate and other water in the cell.

On or about May 28, 2009, WCK ordered Dwire to cease all

7

further work on the site and to vacate it.  At WCK's request shortly thereafter, Aquaterra determined final excavation quantities based on suvery data previously given to Dwire, and Weaver Boos confirmed the final excavation quantities based on actual survey data.  The volume calculations from both engineers were sent to Dwire on or about June 3, 2009.

Dwire submitted its final application for payment dated June 26, 2009, that included a "change order #4" for an additional 63,642" cubic yards of excavated material, a "change order #5" for time and material billings, and "change order #1" for additional equipment.  WCK rejected the new "change orders" and continued to deny the first change order for additional equipment costs.  WCK paid Dwire the total amount of $744,436.20 for what work that WCK believed Dwire had completed under the contract and other adjustments agreed to by the parties.

### Kansas Law on Contract Interpretation

The parties stipulated in the pretrial order that the laws of Kansas governed the substantive issues in the case.  "The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction." *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231 (2009) (citation omitted).  "When a contract is complete, unambiguous, and

free from uncertainty, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidenced by the writing is inadmissible." *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 679-680, 829 P.2d 884 (1992) (citing *First National Bank of Hutchinson v. Kaiser*, 222 Kan. 274, 564 P.2d 493 (1977)). "Unambiguous contracts are enforced according to their plain, general, and common meaning in order to ensure the intentions of the parties are enforced." *Vanum Const. Co., Inc. v. Magnum Block, L.L.C.*, 45 Kan. App. 2d 54, 245 P.3d 1069, 1073 (Kan. App. 2010) (quoting *Johnson County Bank v. Ross*, 28 Kan. App. 2d 8, 10, 13 P.3d 351 (2000)). Reasonable interpretations are favored under the law. *Id.* "[T]he law presumes that the parties understood their contract and that they had the intention which its terms import." *Iron Mound, LLC v. Nueterra Healthcare Management, LLC*, 44 Kan.App.2d 104, 113, 234 P.3d 39, 45 (2010) (quoting *Tri-State Hotel Co., Inc. v. Sphinx Inv. Co., Inc.*, 212 Kan. 234, 246, 510 P.2d 1223 (1973)).

<u>Contractual Requirement for Written Change Order</u>

WCK seeks summary judgment on the plaintiff's breach of contract claims for additional excavation quantities and for time and material billings, as Dwire failed to submit written change orders before performing the work and then only submitted these items as additional costs on its

application(s) for payment.  WCK cites article 10 of the general conditions, a contract document, that is entitled "Changes in the Work; Claims."  (Dk. 56, Ex. 1, p. 11).  Paragraph 10.01 addresses changes ordered by the owner, and ¶ 10.02 provides that a "Contractor shall not be entitled to an increase in the Contract Price  . . . with respect to any work performed that is required by the Contract Documents . . ., except in the case of an emergency . . ., or in the case of uncovering Work . . . ."  Paragraph 10.03 spells out that the contractor and owner are to "execute appropriate Change Orders recommended by Engineer."  The claim procedure for changes in work laid out in the general conditions at ¶ 10.05 was deleted by the supplementary condition and replaced with:

> All Change Orders must be submitted, in writing to the Owner.  The Owner is not responsible for payment on Change Order work that has been completed without approval from the Owner.

*Id.* at p. 56.

There is no dispute that Dwire did not submit written change orders to WCK for the additional excavation quantities or for its time and material billings and, instead, submitted both matters on its applications for payment and just described them as "change order #4" and "change order #5." There is no evidence that WCK approved any written change order for this work or that the Engineer ever approved or recommended approval of any written change orders or payment of the same.  WCK asks the court to

10

enforce the contract provision as written.

Dwire argues against strict enforcement of this "written order" requirement advocating a subsequent modification or waiver of this requirement.  Dwire notes that courts in other jurisdictions have found a waiver of these provisions when the additional work was ordered and payment agreed upon, when the additional work was orally approved and later accepted, or when additional work was done in the presence of the owner.  Dwire also cites decisions that have used estoppel or course of dealing to foreclose the use of these provisions.  Dwire quotes the following on written change order requirements in construction contracts:

> The principle of strict enforcement of 'written order' requirements is now a pale shadow of its former existence.  Since the mid-20th century, the judiciary has recognized the fundamental distinction between authorized changes and written changes, and between the authorization itself and evidence of authorization, and generally has enforced authorized orders in whatever form given.

1 Philip L. Bruner and Patrick J. O'Connor, Jr., *Bruner and O'Connor on Construction Law* § 4:39 (2010).

Dwire asserts first "[t]he course of dealing between the parties (including a prior contract Dwire performed for WCX) together with the course of performance of this contract reveals that WCX-Kansas effectively waived or abandoned the specific written requirements of change orders by adopting (and paying on) procedures that varied from the strict language of the contract."  (Dk. 69, p. 15).  As far as support for this proposition,

11

Dwire's memorandum offers ¶ 30 of its statement of undisputed facts.  The

court has reviewed the deposition citations in which Dwire's agent testified

as to his understanding of WCK's practice on change orders and as to having

based his understanding from dealings under a prior contract and under this

contract.  This testimony is not "argument" as disputed by WCK, and the

credibility of this testimony is not an appropriate issue at this stage.

Dwire further challenges that WCK's practice in denying change

orders did not match the contract terms:

> Although WCX-Kansas occasionally rejected proposed changes on the
> basis that the Owner (WCX-Kansas itself) had not approved the
> change order in advance, WCX-Kansas considered the change order
> requests substantively and took the position that Dwire was not
> entitled to additional compensation with respect to some of the
> proposed changes because the work was arguably part of Dwire's
> scope.  The communications with WCX-Kansas thereby reflect the
> dealings that WCX-Kansas and Dwire had concerning change order and
> claims management.

(Dk. 69, p. 15).  Some of the communications in the summary judgment

record support Dwire's position that WCK decided the substance of Dwire's

requests without asserting and enforcing the contractual requirement for a

written change order.

In reply, WCK labels Dwire's position as "fabricating an alleged

course of dealings" supported only by "self-serving affidavit and its own

deposition testimony."  (Dk. 82, pp. 10, 12).  WCK denies that Dwire has or

can "produce any credible or admissible evidence that the written, approved

change order provision is not enforceable or that WCX-Kansas waived or intended to waive the written change order provision." *Id.* at 12.  WCK asserts the communications show enforcement, rather than waiver, of any provisions.

For purposes of this summary judgment ruling, the court must decide whether Dwire's factual assertions create a genuine issue of material fact concerning modification/waiver of this written change order term.  In doing so, the court is mindful that a party cannot survive summary judgment "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) ("[T]he plaintiff could not rest on his allegations of a conspiracy to get to a jury without any significant probative evidence tending to support the complaint") (internal quotation marks and citation omitted)). Indeed, the non-movant is expected to come forward with specific facts based on admissible evidence and to show more than speculation, conjecture or surmise.  "In ruling upon a Rule 56 motion, a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must

be denied." *Lujan*, 497 U.S. at 888 (internal quotation marks and citation omitted).  The court is not left to assume "that general averments embrace the 'specific facts' needed to sustain the complaint." *Id*.

In its "statement of undisputed facts," Dwire states the following with respect to the contractual provisions governing change orders and cost overruns:

> 30.  With regard to change orders and cost overrruns, Dwire's experience with Waste Connections on both the Pueblo project and the Plumb Thicket job was that WCX-Kansas generally disregarded the contractually specified means of handling additional or changed work and utilized an alternative system through which its own Engineer would generate changes based on post-change submissions from Dwire.  [Dwire 30(b)(6) deposition, Exhibit 20, 147:24-150:9; 160:18-25; 177:17-180:24; 187:9-190:3.]  Moreover, the contractually mandated process-routinely ignored by both parties-proved problematic because it placed both parties in the position of facing a breach during a dispute over compensation if, for example, Dwire were to halt work rather than continuing work with a view toward resolving the dispute later.  [Dwire 30(b)(6) deposition, Exhibit 20, 180:1-182:15.]

(Dk. 69, pp. 5-6).  The court has reviewed these cited deposition excerpts in which the Dwire's corporate representative repeatedly testified that WCK did not follow the contractual provisions requiring written changes in advance of the work.  An example of this testimony is:

> Q.  Right.  Okay.  So let's turn very quickly to the supplementary conditions, and specifically only 1.  And it's on the last page of the document, other than the waiver and release of lien.  So right there, that page.  You know the one I'm going to look at.  § 10.05, what do you understand this provision to do?
> A.  Well, I understand that's the way it's supposed to be done, and what I'm telling you is they don't follow it all the time, and if they

14

dispute it, so what's the contractor to do?  If in this case they say, "No," and then later they say, "Oh, yeah, we did owe that to you," so I sit and wait for the time to run out and get stop work notices, and you're out of the contract because you disagree?  What is the methodology?  The methodology that has been previously done is to talk about it and agree, everything--mostly off paper, even, and the Waste Connections later sends out a change order, much later.'

Q.  But, I mean, you--you agree–

A.  I'll agree what it says.  I don't have a dispute with what it says.  What I'm saying is those terms and conditions are not followed as a matter of practice.

. . . .

Q.  So I'm trying to figure it out.  If there is an e-mail where you submit something, and we immediately say "no," why would you have continued at your own risk, potentially?

. . . .

A.  It's disputed change order.  I can't--I've been through--this contract had a liquidated damages clause.  It had an early completion bonus clause.  It was a disputed item that was later agreed to by Waste Connections, and then later again unagreed to by Waste Connections.

So in the way they performed, I had to do the work and then prove my case later.  I understood that I could not stop--I could have stopped, and then we would be sitting here having a lawsuit about, "You guys never did your work."  So I'm in a no-win situation.  You can say what you want all day, but I'm going to say--to a jury, I would say, "How would you do it?"

(Dk. 69-2, p. 180-82).  The sworn declaration of Frank Spinuzzi further

offers:

5.  In some cases, WCX-Kansas would take the position that only the Owner could approve change orders.  As a matter of practice and dealing between the parties, WCX-Kansas always took the position that it would pay Dwire a fair amount for the work that it agreed was extra that Dwire could reasonably quantify without strict adherence to the contract procedures by either party.  *See* emails Dwire E&E 254-55 & 353-354.  This course of dealing began on the Pueblo Project for Waste Connections, where Brian Karp was my primary contact as well.

(Dk. 69-8, p. 3).

15

The legal framework for deciding whether these facts are sufficiently specific to create a genuine issue of material fact comes from several Kansas appellate court decisions:

> The terms of a written contract can be varied, modified, waived, annulled, or wholly set aside by any subsequently executed contract, whether such subsequently executed contract be in writing or parol. *Coonrod & Walz Const. Co., Inc. v. Motel Enterprises, Inc.*, 217 Kan. 63, 73, 535 P.2d 971 (1975).  This is generally the case in building and construction contracts as well:
>> "A provision in a private building or construction contract that alterations or extras must be ordered in writing can be avoided by the parties to the contract when their words, acts, or conduct amount to a waiver, modification, rescission, abrogation, or abandonment of the provision, or when the owner (or the general contractor in the case of a subcontractor) by his or her acts or conduct is estopped from reliance on it." 13 Am.Jur.2d, Building and Construction Contracts § 25, p. 28.
>
> Whether a term of a written contract has been modified or waived by a subsequent agreement is a question of fact for the trial court. *Belger Cartage Serv., Inc. v. Holland Constr. Co.*, 224 Kan. 320, 330, 582 P.2d 1111 (1978); *see generally* 17A Am.Jur.2d, Building and Contraction Contracts § 510, p. 524 ("Whether a contract has been modified by the parties thereto is ordinarily a question of fact for the trier of fact, as where the evidence is conflicting or the terms of the agreement are equivocal or uncertain.").

*Saddlewood Downs, L.L.C. v. Holland Corp., Inc.*, 33 Kan. App. 2d 185, 193-94 (2004).  In *Saddlewood*, the court found substantial evidence of an express or implied authorization to perform the extra work and to receive compensation at a negotiated price.  This evidence consisted of testimony that the additional work was "specifically authorized" and was the subject of meetings including negotiations over price.  The Court of Appeals rejected the need to prove "a pattern of disregarding written authorization . . . for an

16

oral modification to be binding." 33 Kan. App. 2d at 195.  Though the oral

nature of the modification was an isolated practice, the modification was still

effective based on the circumstantial evidence of authorization, negotiation,

and inaction.  *Id*.

In *Owens v. City of Bartlett*, 215 Kan. 840, 528 P.2d 1235

(1974), the city appealed a monetary judgment to the contractor for

compensation on additional work.  The city argued that the contract required

written authorization for all extra work and that the contractor did the work

here without written authorization.  The Kansas Supreme Court discussed

the law and facts on waiver/modification:

> Parties to a contractual transaction may mutually rescind the
> transaction although neither party had a right to compel a recision.
> (citation omitted).  In such a case the terms of the written contract
> may be varied, modified, waived, annulled, or wholly set aside by any
> subsequent executed contract whether such subsequent executed
> contract be in writing or parol.  (citation omitted).
>
> It is generally recognized that the mere fact that extra work or
> materials have been done or furnished with the knowledge of the
> proper officer or representative of the public entity, without any
> objection on the part of such officer or representative, does not,
> standing alone, establish a waiver or modification of a stipulation
> requiring a written order for such work.  (citation omitted).  However,
> a waiver or modification of such stipulation may properly be found
> where it appears that the work or materials were orally ordered or
> authorized by the public entity through its proper officer or
> representative and there are other circumstances tending to show an
> intention to waive or otherwise derogate from the stipulation on the
> part of the public entity.  (citations omitted).
>
> In the present case the parties, throughout the performance of
> the contract, entirely disregarded the stipulation. . . .  This same
> course of conduct was followed throughout the performance of the
> contract and city entirely disregarded the stipulation for orders in

writing.

215 Kan. at 844-45.  The Court laid out specific instances when the City had

orally ordered extra work that the Contractor performed without dispute and

when the City had paid the Contractor for some extra work done without a

written order.  215 Kan. at 845.

The Kansas Court of Appeals recently emphasized taking a

stricter approach for construing and enforcing a written notice requirement

for changed conditions.  *Razorback Contractors of Kansas, Inc. v. Board of

Johnson County Comm'rs*, 43 Kan. App. 2d 527, 536, 227 P.3d 29 (2010).

The district court granted summary judgment against the contractor's claims

for additional compensation due to changed conditions, because the

contractor had "failed to provide notice of its claim in accordance with the

parties' contract" and because the Board had not waived its right to notice

under the contract.   *Id.* at 528, 532.  The court noted a line of decisions

generally holding "that written-notice-of-changed-conditions provisions

should be strictly enforced."  *Id.* at 536.  On the issue of waiver, the court

noted that the Contractor argued a fact dispute was created by the Board

accepting late written notice and acting on the Contractor's oral claim for a

contract price adjustment.  The Court of Appeals noted that unlike in *Owens*

the Contractor failed to provide "evidence that the Board consistently

disregarded the notice requirements of the contract."  *Id.* at 545.  As for

*Saddlewood*, the district court properly distinguished it as the owner there

had "expressly authorized the extra work and had paid for it." *Id*. The

Court of Appeals panel summarized Kansas law on waiver:

> Waiver is the intentional relinquishment of a known right. *Postal
> Savings & Loan Ass'n v. Freel*, 10 Kan.App.2d 286, 287, 698 P.2d 382
> (1984). Waiver may be inferred from conduct. *See Lyons v. Holder*, 38
> Kan.App.2d 131, Syl. ¶ 7, 163 P.3d 343 (2007). However, in order to
> establish waiver there must be evidence that manifests, in an
> unequivocal manner, an intent that is inconsistent with the intent to
> claim a right. *See Patrons Mut. Ins. Ass'n v. Union Gas System, Inc.*,
> 250 Kan. 722, 725–26, 830 P.2d 35 (1992). Therefore, in order to
> create a genuine issue of material fact on the issue of waiver and
> thereby avoid summary judgment, it was incumbent upon Razorback
> to direct the district court (and us) to evidence from which a jury could
> conclude that the Board, in an unequivocal manner, manifested its
> intention to relinquish its right to written and timely notice of any
> claim for additional compensation in accordance with the contract's
> terms.

*Id*. at 545. The court applied these principles, concluding: "We fail to see

how this one extension of Razorback's performance time constitutes

evidence that unequivocally manifested the Board's intent to relinquish its

right to timely, written notice of a claim for additional compensation." *Id*. at

546.

The burden certainly rests with Dwire to demonstrate a waiver or

modification of the contract terms. *See Alexander v. Wehkamp*, 171 Kan.

285, 289-90 (1951) (burden of proof lies with party arguing that written

contract was subsequently modified); *Zenda Grain & Supply Co. v. Farmland

Indus., Inc.*, 20 Kan.App.2d 728, 745-46 (1995) (argument that party

19

waived its right to recover by continuing contract after knowledge of breaches is a defense).  Though a close question, the court concludes that Dwire has come forward with sufficient evidence to create a genuine issue of material fact as to whether WCK waived the written change order requirement through its course of dealing.  Dwire's evidence is certainly more than what had been offered in *Razorback* on this issue, and the circumstances are different in that WCK's emails show they frequently considered the merits of Dwire's change requests without citing these contractual provisions as a ground for denial.  Dwire also includes an email from Brian Karp dated March 17, 2009, that says, "A deductive change order is not necessary.  These things have a way of working themselves out." (Dk. 69-8, p. 9).  Inferences reasonably drawn from all of these exchanged emails support Dwire's position that WCK did not stand on the formal enforcement of this written change order requirement.  The court denies WCK's request for partial summary judgment based on Dwire's failure to comply with written change order provision.

<u>Contract Requirements for Changed Conditions</u>

WCK points to ¶ 4.03 of the General Conditions that provides in relevant part:

4.03   *Differing Subsurface or Physical Conditions*
A.   *Notice*:  If Contractor believes that any subsurface or physical condition at or contiguous to the Site that is uncovered or revealed either:

      1. is of such a nature as to establish that any 'technical data' on which Contractor is entitled to rely as provided in Paragraph 4.02 is materially inaccurate; or

      2. is of such a nature as to require a change in the Contract Documents; or

      3. differs materially from that shown or indicated in the Contract Documents; or

      . . . .

then Contractor shall, promptly after becoming aware thereof and before further disturbing the subsurface or physical conditions or performing any Work in connection therewith (except in an emergency as required by ¶ 6.16.A), <u>notify Owner and Engineer</u> in writing about such condition. Contractor shall not further disturb such condition or perform any Work in connection therewith (except as aforesaid) until receipt of written order to do so.

(Dk. 56, Ex. 1, p. 19) (underlining added).  Assuming the longer hauling distance for export was a changed condition, WCK argues that Dwire failed to provide the required notice to the Engineer and failed to stop work until it received a written order.  Assuming the leachate and water in the work area was a changed condition, WCK also contends that Dwire failed to stop work until it received a written order and failed to notify WCK of the amount of time and material billing until after the contract was terminated.

      Dwire opposes the motion arguing that ¶ 4.03 applies "only to variances between (a) physical and subsurface conditions as they are 'uncovered or revealed' and (b) subsurface or physical conditions as they were depicted in contract documents."  (Dk. 69, p. 17).  Dwire denies that this provision applies to its claim based on the additional and longer hauls required by WCK's change of the export site or its claim based on the

additional work created by runoff and percolation from WCK's adjoining cell. Dwire asserts "[n]either of these conditions constituted a different 'physical condition' in terms of comparing the actual physical properties of the earthwork in place with the physical properties anticipated."  (Dk. 69, p. 17). And assuming that ¶ 4.03 applies, Dwire argues that it provided timely and detailed notice of the additional work it was performing and that WCK's response was only to deny that Dwire was entitled to more compensation because WCK regarded the work as already covered by the contract.  In light of WCK's position, Dwire argues it would be inequitable and absurd to read and apply the contract to require Dwire either risk the breach of the contract or risk not being compensated for the additional work.

In reply, WCK insists Dwire's claims are premised on "changed circumstances" that would come under ¶ 4.03.  WCK summarizes its position in this way:

Assuming, *arguendo*, Dwire's version of the facts regarding the alleged communications and Dwire's alleged submittal of an "excavation plan" prior to the bid and if WCX-Kansas actually "reversed course" as alleged by Dwire, then that certainly would constitute changed circumstances under Paragraph 4.03.  Specifically the technical data (e.g., excavation plan) on which Dwire was entitled to rely would be materially inaccurate; the condition at the site (e.g., locations for the placement of excavated material) would be materially different than the parties allegedly discussed and allegedly agreed to; and the change itself is of such nature as to justify a change in scope.
Similarly, Dwire's claims for time-and-material billing have to be, by their very nature, associated with some changed circumstance that was not addressed in the Contract or the Contract Documents.

22

(Dk. 82, p. 15).

The parties offer only the most conclusory arguments on the meaning of ¶ 4.03 and cite no authorities on the meaning and interpretation of a changed conditions clause. The court's own reading of legal authorities concerning the purpose and scope of such clauses persuades it that summary judgment is inappropriate. Contrary to WCK's arguments, the scope of ¶ 4.03 does not encompass any changed circumstance but only "differing subsurface or physical conditions," that is, "any subsurface or physical condition at or contiguous to the Site that is uncovered or revealed either: . . . ." WCK has not shown for summary judgment purposes that either of Dwire's claims come within the scope of ¶ 4.03 and, therefore, are subject to its requirements. As Dwire explains, its claim for additional hauling expenses apparently is not based on different subsurface or physical condition at the site but on WCK's change of directives. As for the additional work caused by the leachate or runoff, WCK has not shown that rainfall, like other weather conditions, result in changed conditions that are covered by ¶ 4.03. Partial summary judgment is denied on this claim.

<u>Excavation Quantities</u>

Article 5 of the General Contract obligated WCK to pay for completion of unit price work in "an amount equal to the sum of the established unit price for each separately identified item of Unit Price Work

times the estimated quantity of that item . . . ."  (Dk. 56, Ex. 1, p. 3).  This

same article provided that "estimated quantities are not guaranteed, and

determinations of actual quantities and classifications are to be made by

Engineer as provided in ¶ 9.07 of the General Conditions."  *Id.*  Paragraph

9.07 provides:

> A.  Engineer will determine the actual quantities and classifications of
> Unit Price Work performed by Contractor.  Engineer will review with
> Contractor the Engineer's preliminary determinations on such matters
> before rendering a written decision thereon (by recommendation of an
> Application for Payment or otherwise).  Engineer's written decision
> thereon will be final and binding (except as modified by Engineer to
> reflect changed factual conditions or more accurate date) upon Owner
> and Contractor subject to the provisions of Paragraph 10.05.

(Dk. 56, Ex. 1, p. 36).  Additionally, under the Scope of Work that is part of

the project manual, it specifies that the "measurement for payment" for

excavation of existing soil and rock to subgrade elevations "shall be based

on completed excavation cubic yards substantiated by survey data."  (Dk.

56, Ex. 15, pp. 1-2).

WCK moves for summary judgment arguing the uncontroverted

facts show that these provisions were properly followed, that the final

calculations were properly made by the Engineer and verified by Weaver

Boos, and that WCK paid Dwire based on these calculated and verified

quantities.  Dwire counters that it was denied the opportunity to meet,

discuss, and review the preliminary determinations with the Engineer,

despite making a specific request for the meeting.  Dwire asserts this lost

24

opportunity denied it the chance to determine errors in the calculations and to persuade the Engineer to change the calculations based on more accurate data.  Dwire contends its quantity calculations are more accurate than those used by the Engineer, and the Engineer did not consider and reject Dwire's data before making his final reported calculations.  Despite the contractual presumption in favor of the Engineer's calculations, Dwire offers that a jury could view the Engineer's failure to meet and review as grounds for rejecting those calculations.  In short, Dwire alleges it was denied the benefit of these provisions that set up a quantifying process involving communications as "to ensure fairness and accuracy, as well as an opportunity to present more accurate data."  (Dk. 69, p. 20).

In reply, WCK cites a provision from the Technical Specification Section 01710 and argues for the first time that it was Dwire's duty to survey for measurement and payment and verify construction quantities and to submit the survey information and its preliminary determination to the Engineer.  WCK alleges Dwire failed to submit to the Engineer the required survey data or preliminary calculations in support of its excavation quantities.  Because these arguments are first raised in WCK's reply brief, the court will not consider them.  "Courts in this district generally refuse to consider issues raised for the first time a reply brief."  *Niles v. American Airlines, Inc.*, 563 F. Supp. 2d 1208, 1213 (D. Kan. 2008) (citing *Liebau v.*

25

*Columbia Casualty Co.*, 176 F. Supp. 2d 1236, 1244 (D. Kan. 2001); *see*

*Mike v. Dymon, Inc.*, No. 95–2405–EEO, 1996 WL 427761, at *2 (D. Kan.

July 25, 1996) ("In pursuit of fairness and proper notice, the court generally

summarily denies or excludes all arguments and issues first raised in reply

briefs.")); *cf. Hutton Contracting Co. v. City of Coffeyville*, 487 F.3d 772,

788 (10th Cir. 2007) ("[W]e do not consider arguments raised for the first

time on appeal in a reply brief.").

      Also in reply, WCK contends:

> It is outrageous that Dwire has the temerity to claim that the
> entire Contract provision regarding substantiation of excavation
> quantities by survey data must be thrown out because the Engineer
> did not review its calculations with Dwire before submitted them and
> simultaneously assert that it should not be held to the same standards
> in the written, approved change order provision and the changed
> condition provision.  It is clear that Dwire is "cherry picking" what
> provisions it believes should be enforced.  Even if the Engineer and
> Dwire did not communicate, the remedy for this failure cannot be that
> the nonperforming party gets to substitute its own methodology for
> determining excavation quantities contrary to the express provisions of
> the Contract, thus benefitting from its own failure to submit the
> documentation and follow-up with the Engineer.

(Dk. 82, pp. 17-18).  Arguments about "temerity" and "cherry picking" are

not proper fare for summary judgment proceedings.  The conclusory

challenge that "the remedy . . . cannot be" is not supported by legal analysis

or citations and appears for the first time in the reply brief.  Neither party

has briefed this remedy issue, and so the issue is not ripe for the court's

decision.[1]

Finally, WCK in reply devotes a couple pages of argument to Dwire not coming forward with "any credible or admissible evidence showing that the quantity calculations made by two, independent professional engineers are not:  (1) consistent with the Contract;  (2) based on actual survey data; or (3) materially accurate."  *Id*. at 18.  The detail and breadth to this argument is nowhere found in WCK's original motion.  Even so, Dwire's declaration from Frank Spinuzzi and attached emails are sufficient to avoid summary judgment on these issues.[2]  The court denies WCK's motion for partial summary judgment on these arguments.

<u>Additional Equipment Costs</u>

---

[1]Unfortunately, the parties did not timely define this issue and properly brief it for purposes of these summary judgment proceedings.  It is not the court's responsibility to identify the applicable legal doctrine, to cite the proper legal authorities, and to apply them to an issue when the moving party is content to argue only that "the remedy for this failure cannot be."

[2]The court does note that WCK's exhibits 4 and 5 appear to contradict Dwire's position that "surveyors used a combination of a point survey for some data points, and an aerial survey for a <u>substantial</u> portion of the initial conditions."  (Dk. 69, p. 7, ¶ 36) (underlining added).  Of course, this alone does not entitle WCK to summary judgment on this claim, as Spinuzzi disputes the accuracy of aerial surveys versus its load count data and challenges the Engineer's reliance on those surveys for some of the calculations.  The court will not entertain WCK's argument on Dwire's lack of expert testimony, as that issue has not been fully and timely raised in this particular motion proceeding.

WCK comes forward with another set of arguments[3] challenging Dwire's claim to recover for additional equipment costs caused by longer hauling distances for more of the export.  Dwire submitted a change order on March 13, 2009, describing the situation as a "[c]hange in conditions due to export placement" and stating that before making its bid it was "directed to export most of the cell material to the draw to the West of the cell, and take the remaining material to the stockpile location," and that if the draws just west of the cell are unavailable for exported material, then Dwire will have additional equipment costs totaling, $178,273.70. (Dk. 56, Ex. 6).  WCK argues that Dwire's "sole basis" for claiming it was directed to use the west draws is an email dated February 19, 2009, sent by Mr. Karp to all bidders, that states:  "The material that is being excavated from the cell will be placed in the draw that is directly west of the cell (approx 0.25 mile haul at most) and will be used to create a haul road to access the cell.  The draw should hold the majority of the material and the remainder can be stockpiled."  *Id.* at Ex. 16.

---

[3]In case the parties have missed this point, the manner in which the issues have been presented and argued for and against summary judgment have thwarted the court's efforts at providing a meaningful opinion that could "focus the issues at trial and . . . could save the parties, and the Court, considerable time and expense."  (Dk. 97, p. 2).  Instead of sharply defined legal issues, clearly stated factual statements, and adequately cited and analyzed legal authorities, the parties' filings resemble more what might be filed in a mediation proceeding argument with hastily made arguments lacking detail and definition and offering more rhetoric than law or fact.

WCK's first argument is that Dwire "cannot credibly argue that there was any 'changed condition entitling Dwire to an equitable adjustment under" ¶ 4.03 C 2 of the General Conditions.  (Dk. 56, p. 16).  Specifically, WCK challenges that Dwire had the opportunity to determine how much export material the draw would hold (site inspection, drawings and its own examination and testing), that Dwire represented in the contract it had "visited the Site and was satisfied as to the general, local and site conditions that could affect the cost, progress and performance of the project," and that Dwire's failure to confirm the conditions prevents it from asserting a change order.  (Dk. 56, p. 17).  WCK denies that Dwire is entitled to any equitable adjustment for a changed condition, as the condition here could have been verified through further investigation and studies and Dwire represented that it had done so.

WCK next contends that Dwire's assertion that it relied on the email "is simply not credible."  (Dk. 56, p. 19).  WCK points to Article 9.01 of the Contract that identifies the "Contract Documents" and to paragraph C that states, "There are no Contract Documents other than those listed above in this Article 9."  WCK argues that if Dwire had relied on the email then it should have included it as a contract document and that Dwire's failure to include it means "the email is not a Contract Document and there is no 'change in conditions' allowing Dwire to submit a change order."  (Dk. 56, p.

19).

Dwire responds that WCK's email came in direct response to its email pre-bid inquiry about the disposal sites. Dwire cites deposition testimony showing it did not merely assume a "majority" of the export would fit in the adjacent draw but actually used its survey and data to calculate that all but 40,000 yards could be placed in that draw. Dwire offers evidence that it relied on this representation in the email about the use of the west draw and calculated its bid based on that representation. Dwire offers deposition testimony that it discussed at a preconstruction meeting with WCK representatives its plans for taking most of the export to the west draw and that WCK was excited about these plans and the results from them.[4] Dwire discloses the dispute turns, in part, on the meaning and understanding of "draw" as used in WCK's email, and Dwire offers that questions of material fact surround this issue.

Again, the parties have not provided the court with a legal framework and citations for analyzing their arguments of fact and equity.

---

[4]In its brief, Dwire states: "Moreover, prior to bidding the job Dwire discussed with Mr. Karp exactly what it planned to do in terms of using the draws, and Mr. Karp not only agreed, he was very pleased that the cost would be substantially diminished because of the proposed placement of excavated dirt." (Dk. 69, p. 21). This statement appears without a citation to the record. The court closely read ¶ 28 of Dwire's "Statement of Undisputed Facts" including all the record cited in that paragraph. The court was unable to find evidence clearly indicating that Dwire's discussions with Karp on these plans occurred prior to Dwire's bid.

WCK couches its motion on Dwire being unable to argue "credibly" a changed condition or its reliance on the email.  Summary judgment proceedings do not permit determinations of credibility.  Dwire has presented sufficient evidence that it relied on WCK's representation about using the west draw and that it regarded WCK's subsequent refusal to allow full use of the "draw" to be a changed condition.  WCK's arguments do not merit summary judgment.

<u>Time and Material Billing</u>

WCK contends that Dwire is not entitled to "time and material" billing for removal of water and mud from the excavation site and for extra "rain flap" work.  WCK summarily argues that the contract provides no basis for time and material billing and that Dwire did not submit any written change order for this work and never received written approval to perform the time and material work.  WCK cites different provisions of the Contract Document that make Dwire responsible for controlling leachate and surface water and for draining and pumping water or mud from the site.  WCK denies that Dwire has any contractual basis for claiming WCK was responsible for controlling surface water or leachate from entering the site. As for the "rain flap" work, WCK argues that Dwire did not comply with the ¶ 4.03 procedures for "changed conditions," that the rain flap was not a changed condition as Dwire knew its actual condition when it entered into

the contract, and that any errors or mistakes in the plans should have been discovered by Dwire if it had done its own reasonable pre-bid examination and investigation.

Dwire claims the "rain flap" work "is additional work that was not set out in the original plans and specifications" and, therefore, is not subject to the "changed conditions" provision of the contract.  Dwire asserts there was an agreement that this additional work would be paid on a time and materials basis.  While the initial site conditions may have suggested there would be some additional work, Dwire denies this would have been enough to justify including this as a claim for expenses on the bid.  Finally, Dwire believes these are factual questions for the jury to resolve.

As for Dwire's breach of contract claim for time and material costs associated with removal of water and corresponding mud, WCK is entitled to partial summary judgment on this claim.  Dwire has not carried its summary judgment burden of offering anything to contest WCK's showing that Dwire was contractually responsible from the outset for controlling leachate and surface water and for draining and pumping water or mud from the site.  WCK fully supported its position with citations to several contract documents.  Dwire has not come forward with any meaningful argument or evidence to show this was additional work that could be billed on a time and material basis.

With regard to the "rain flap work" claim, Spinuzzi's email dated April 24th certainly shows that Dwire believed it was being asked "to perform some work that is not shown on the plans nor spelled out in the scope of work." (Dk. 56, Ex. 19). Brian Karp, on behalf of WCK, replied by email that same day:

> Regarding the conference call this morning, I can see where the confusion would come in if you've never constructed on a landfill before with a rainflap, but how did you think that you were going to tie in the sand layer and the pipes if you didn't excavate all the way back to the rainflap and cut it open? The other two contractors that bid on the project had an average unit rate of $9.00/linear foot. You submitted a bid of $5.00/linear foot. I would approve a CO in the amount of $6,000 for this task which would effectively bump your unit rate up to $9.00 for this task. . . . Let me know if you are agreeable to these terms.

(Dk. 69-8, p. 26).[5] The court believes the emails and deposition testimony show there are questions of material fact over whether the rain-flap work was within the scope of the contract.

WCK further challenges that Dwire cannot prove any agreement for the rain flap work to be paid on a time and materials basis. As a statement of undisputed fact, Dwire asserts the parties "had developed a process by which Dwire would perform some work on a 'time and materials' basis under which Dwire would perform the work, track its costs, and submit the costs for reimbursement by WCX-Kansas upon completion of the work."

--------------------------------------------------

[5]According to WCK's reply brief, it paid Dwire based on this adjusted rate and Dwire never objected but accepted the additional money. (Dk. 82, p. 22).

33

(Dk. 69, p. 7, ¶ 35).  The evidence cited by Dwire for this developed "process" of doing some work on a "time and materials basis" merely shows that the parties under the Colorado contract had a process of exchanging emails and then agreeing that certain work outside the scope of the contract would be done on a time and materials basis.  (Dk. 69-2, pp. 187-191). While there may be a question of material fact over whether this process was part of the working relationship between Dwire and WCK, Dwire still has the burden of coming forward with some evidence that such an agreement actually existed for this rain flap work.  Dwire apparently concedes it lacks such proof.  Dwire states as an undisputed fact that for the rain flap work it "submitted its changes on this similar time and materials basis although Mr. Karp wanted the additional work added on a unit price basis."  (Dk. 69, p. 7, ¶ 35).  Dwire similarly relies on deposition testimony proving that WCK had not agreed to the rain flap work being done on a time and materials basis. (Dk. 69-5, p. 626).  The court grants partial summary judgment on Dwire's breach of contract claim for time and material billing on the rain flap work.

<u>Unjust Enrichment and Promissory Estoppel</u>

It is hornbook law that quasi-contractual remedies, such as unjust enrichment and promissory estoppel, are unavailable "when an enforceable express contract regulates the relations of the parties with respect to the disputed issue."  *Member Services Life Ins. v. American Nat.*

34

*Bank*, 130 F.3d 950, 957 (10th Cir. 1997) (citations omitted), *cert. denied*, 523 U.S. 1139 (1998); *see also School-Link Technologies, Inc. v. Applied Resources, Inc.*, 471 F. Supp. 2d 1101, 1116 (D. Kan. 2007); *Ice Corp. v. Hamilton Sundstrand, Inc.*, 444 F. Supp. 2d 1165, 1170 (D. Kan. 2006); *Jacobs v. Dudek*, 2006 WL 213865 at *4, 126 P.3d 1132 (Table) (Kan. App. 2006); *see, e.g., 10th Street Medical, Inc. v. State*, 42 Kan. App. 2d 249, 257, 210 P.3d 670 (2009) ("promissory estoppel is inapplicable" when the claim is principally a dispute over the performance of the parties under the contract).  WCK seeks summary judgment on these claims pointing to the express contract as governing all issues related to these claims.  Dwire responds that this rule would not preclude its alternative theory claims for additional work performed that "was outside the scope of the original contract and therefore not subject to its terms, such as the rain flap."  (Dk. 69, p. 23).  Dwire argues its claims should not be rejected summarily "[t]o the extent that a jury can permissibly find that some of Dwire's work was additional work outside the scope of (and not governed by) the contract between the parties."  *Id.*  In reply, WCK argues the rain flap work was within the scope of the contract either as work that Dwire was required to perform or as work covered under the contractual provisions for a changed condition, a change order, or additional work.

Dwire's defense of its unjust enrichment and promissory

35

estoppel claims is limited to the rain flap work.  Dwire offers nothing to

dispute that all of its remaining claims for other work are subject to the

general rule that the express written contract is governing and precludes

recovery under any quasi-contractual remedies.  Dwire fails to come forward

with authorities and evidence to show that the terms of the contract did not

govern the disputed issues over the rain flap work.  The court's own

research revealed this general approach:

> Because most construction contracts contain exhaustive provisions
> governing the rights and obligations of the parties even in the event of
> a material breach, restitutionary remedies ordinarily are available in
> construction disputes only when (1) an express contract: . . . (c)
> relates to directed changes in the work deemed to have been
> authorized under a separate oral contract not governed by a changes
> clause . . . .

*Bruner and O'Connor on Construction Law* § 19:36 (2010) (footnotes

omitted).  Dwire has made no showing that the contract's provisions for

change orders on additional work would not be controlling of its claim for

this extra work.  *See Trinity Products, Inc. v. Burgess Steel, L.L.C.*, 486 F.3d

325, 333 (8th Cir. 2007).  These provisions appear to address the parties'

responsibilities concerning additional work and for resolving disputes over

such work.  Dwire does not address why the application of these provisions

would not bar its claims for unjust enrichment and promissory estoppel.  The

court grants WCK's motion for partial summary judgment on these quasi-

contractual remedy claims.

**WCK'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON ITS COUNTERCLAIMS (Dk. 96)**

WCK seeks partial summary judgment as to Dwire's liability on WCK's own breach of contract counterclaims. Specifically, WCK seeks an order determining as a matter of law that Dwire breached the contract in defectively installing a portion of the new cell soil liner, in damaging the existing cell geomembrane liner and existing rain flap on the adjacent landfill cell, and in not completing the contract and being liable for WCK's actual costs to complete the contract after a termination for cause.

Under Kansas law, the person bringing a claim for breach of contract has the burden to prove all of these essential elements: (1) the existence of a contract between the parties; (2) sufficient consideration; (3) the plaintiff's performance or willingness to perform in compliance with the contract; (4) the defendant's breach of the contract; and (5) damages to the plaintiff caused by the breach. *Commercial Credit Corporation v. Harris*, 212 Kan. 310, Syl. ¶ 2, 510 P.2d 1322 (1973); *City of Andover v. Southwestern Bell Telephone*, 37 Kan. App. 2d 358, 362, 153 P.3d 561 (2007); *Kipp v. Myers*, 753 F. Supp. 2d 1102, 1110-1111 (D. Kan. 2010). If the movant for summary judgment has the burden of proof on that claim or defense, then it must show that the undisputed facts establish every element of the claim or defense. *Media Services Group, Inc. v. Lesso, Inc.*, 45 F. Supp. 2d 1237, 1239 (D. Kan. 1999); *see United Missouri Bank of Kansas City v. Gagel*, 815

F. Supp. 387, 391 (D. Kan. 1993).  If that movant fails to come forward with

sufficient evidence on an essential element of its prima facie case, then "all

issues concerning all other elements of the claim and any defenses become

immaterial."  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.

1998) (citation omitted).  The movant also must show the absence of

genuine issues of fact regarding each of the affirmative defenses asserted by

the non-moving party.  *Spires v. Sunflower Elec. Co-op., Inc.*, 280 F. Supp.

2d 1271, 1276 (D. Kan. 2003).

WCK premises its motion for summary judgment on the

following:

> There is no dispute that a contract exists between the parties.
> See Exhibit 1.  Neither party has asserted that the Contract is void due
> to lack of consideration.  There is no dispute that Dwire received
> compensation for those items it actually completed under the Contract.
> (footnote omitted).  Similarly, there is no dispute that WCX-Kansas
> performed by paying Dwire for the work that it actually completed
> under the Contract.  There is no dispute that WCX-Kansas paid
> significant sums to repair the damage to the existing cell
> geomembrane liner and rain flap, correct the defects in the new cell
> soil liner and complete the remaining items under the Contract.  Karp
> Decl. ¶¶ 24.-25.  The only question for the Court is whether Dwire
> breached the Contract and specifically the relevant provisions of Article
> 6-Contrator's Responsibilities.  See Exhibit 1, General Conditions,
> Article 6.

(Dk. 97, p. 14).  The footnote omitted from the above states:  "Dwire was

paid over $744,000.  Dwire's additional claims for compensation claims

relate to an alleged dispute over excavation quantities and unjustified

change orders.  *See* Motion for Partial Summary Judgment on Dwire's

38

claims." *Id.* at n. 1.

Dwire points out that it brought this suit claiming WCK had not paid for all of Dwire's work.  This order already denies most of WCK's motion for partial summary judgment on Dwire's claims for compensation, including Dwire's claims related to change orders and additional compensation and WCK's refusal to approve the change orders and additional compensation. Because there are genuine issues of material fact over WCK's compliance with the contract, Dwire concludes that WCK has not come forward with undisputed facts establishing the third element of its burden of proof. Dwire's conclusion appears correct,[6] and the court finds it would be immaterial for the court to consider WCK's arguments and evidence as to the remaining elements.  The court did study the parties' briefs and reviewed every citation to the record, and the court would not have granted partial summary judgment on WCK's remaining arguments.  WCK's motion essentially asks the court to make a credibility determination as between its

---

[6]WCK's reply approaches this issue principally as Dwire's affirmative defense rather than as part of WCK's burden of proof.  As the movant seeking summary judgment on its counterclaims, WCK had the burden in its original motion to address how it had fully and materially complied with the contract despite all the known claims and issues that Dwire had brought in this case.  WCK failed to carry that burden.  For that matter, WCK in its reply did not go through each of these claims and issues and show as a matter of law and fact that none would be an arguable ground of non-compliance as to prevent it from recovering for breach of contract.  This order's prior discussion of those claims and issues certainly precludes any summary judgment on WCK's counterclaims.

Construction Quality Assurance engineer and one of Dwire's officers.[7]
Summary judgment is not the proper setting for that determination.

## DWIRE'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON WCK'S COUNTERCLAIMS FOR INDEMNIFICATION AND NEGLIGENCE (DK. 98)

A fair reading of Dwire's motion shows it to address WCK's counterclaims for:  (1) Dwire's breach of contract in not reimbursing WCK for costs and expenses that it incurred for one of its employees who was injured while performing repairs allegedly required by Dwire's excavation work at the landfill; and (2) Dwire's negligence in the leaving the site in a potentially dangerous condition for persons working below in the new cell.  Dwire contends WCK is unable to come forward with any genuine issues of material fact to show that Dwire breached any duty owed to WCK's employees or that Dwire's work caused the employee's injury.

The summary judgment pleadings show the following to be undisputed.  On or about May 28, 2009, WCK ordered Dwire to cease all further excavation work on the site and to vacate.  WCK took over completion of the new cell including preparing the new liner to be tied into the existing liner for the adjacent cell.  On June 10, 2009, WCK's employees,

---

[7]The court recognizes that some of Dwire's cited deposition testimony on these issues, as well as earlier ones, approaches being "conclusory."  Due to the subject matter of the testimony and to the state of the summary judgment record, the court is not in a position to pierce the logic and substance of what is said in that testimony.

Gerald Hawel, Mark Sproul and Shad Pletcher were working in the new cell.

Hawel was on his hands and knees cutting by hand a uniform line in the

existing liner so that it could be linked to the new liner.  Twenty to forty feet

away from and higher than Hawel, Pletcher was operating an excavator to

move dirt.  Sproul was on the ground shoveling sand off the liner and

spotting for Pletcher.  Hawel had been working for about two hours when a

rolling rock struck him in the left hip and injured him.  Hawel did not see or

hear the rock before it hit him, and he does not know where it came from.

Sproul did not see the rock before it hit Hawel.  Pletcher, however, did see

the rock rolling toward Hawel, but he does not know from where it came.

Dwire seeks partial summary judgment arguing its duty to

indemnify applies only for negligent acts or omissions.  Dwire contends the

record establishes WCK is unable to prove that Dwire left the site in an

unsafe condition or that Dwire created the condition which resulted in the

boulder becoming dislodged and rolling into Hawel.  Dwire asserts its not

enough for WCK to say that Dwire was the last one to do excavating work in

the area where Hawel was injured and, therefore, is responsible for leaving

the site in a dangerous condition.  Dwire points to the lack of expert witness

testimony for WCK and concludes:

> Waste Connections' liability claim rests upon a purely coincidental set
> of facts.  The company would have the Court believe that Dwire owed
> a duty to secure a random boulder, approximately 12 inches in
> diameter, from rolling down a hill two weeks later while Waste

41

> Connections continued to excavate.  The scenario is more absurd when considering there were likely hundreds of similar rocks strewn about the site.

(Dk. 99, p. 12).  "No one knows where the rock came from and yet Waste Connections alleges Dwire was negligent in leaving the rock positioned in a dangerous location two weeks earlier."  *Id.* at 16.  "More importantly, absolutely no evidence has been developed that any Waste Connections' employee believed the cell to be unsafe when Hawel was injured."  *Id.* Finally, Dwire argues for intervening causes in the form of two weeks of weather and others performing excavation work at the site.

WCK summarizes its position as seeking first reimbursement under the construction contract for its costs and expenses incurred for this injured employee and, in the alternative, a claim for Dwire's negligence. WCK points to several general conditions for its breach of contract claim, beginning with ¶ 6.09:

> B.  If Contractor performs any Work knowing or having reason to know that it is contrary to Laws or Regulations, Contractor shall bear all claims, costs, losses, and damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) arising out of or relating to such Work.

WCK also relies on ¶ 6.11[8]:

> 1.  Contractor shall confine construction equipment, the storage

---

[8]The applicability of ¶ 6.11 is unclear to the court, as it appears to address the Contractor's duty with regard to adjacent land that is not part of the site.

of materials and equipment, and the operations of workers to the Site and other areas permitted by Laws and Regulations, and shall not unreasonably encumber the Site and other areas with construction equipment or other materials or equipment.  Contractor shall assume full responsibility for any damage to any such land or area, or to the owner or occupant thereof, or of any adjacent land or areas resulting from the performance of the Work.
. . . .
3.  To the fullest extent permitted by Laws and Regulations, Contractor shall indemnify and hold harmless Owner and Engineer, . . . arising out or relating to any claim or action, legal or equitable, brought by any such owner or occupant against Owner, . . . to the extent caused by or based upon Contractor's performance of the Work.

WCK also refers to the safety and protection provisions in ¶ 6.13[9]:

A.  Contractor shall be solely responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work.  Contractor shall take all necessary precautions for the safety of, and shall provide the necessary protection to prevent damage, injury or loss to:
1.  all persons on the Site or who may be affected by the Work;

Finally, WCK relies on the general indemnification provision at ¶ 6.20:

A.  To the fullest extent permitted by Laws and Regulations, Contractor shall indemnify and hold harmless Owner and Engineer, and the . . . from and against all claims, costs, losses, and damages . . . arising out of or relating to the performance of the Work, provided that any such claim, cost, loss, or damage is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work itself), including the loss of use resulting therefrom but only to the extent caused by any negligent act or omission of Contractor, any Subcontractor, and Supplier, or any individual or entity directly or indirectly employed by any of them to perform any of the Work or anyone for whose acts any of them may be liable.

WCK argues that the provisions at ¶¶ 6.09, 6.11 and 6.13 make Dwire

---

[9]WCK does not cite the remedy provision also in this paragraph.  This provision does not appear to encompass ¶ 6.13.A.1 on which WCK is relying.

"strictly liable for injuries or losses arising out of the performance of its work."  (Dk. 102, p. 14).  Dwire did not identify or discuss the meaning and applicability of these provisions in its original motion, and Dwire's reply brief was not timely filed.  The court has no choice but to deny Dwire's motion on this ground alone.  The court will briefly discuss some of the other matters raised in Dwire's motion.

WCK argues that Dwire misconstrues the indemnity provision at ¶ 6.20A to require that WCK must prove Dwire was negligent.  This provision plainly provides that Dwire has a duty to indemnify for all claims arising out its performance "but only to the extent caused by any negligent act or omission of Contractor."  WCK does not argue this provision is ambiguous but does cite case law for its position of reading out this causation/negligence clause.  The cited case law is plainly distinguishable.[10] WCK correctly notes that with the "adoption of comparative negligence in 1974, Kansas courts compare the percentages of fault of all alleged

_____

[10]The plaintiff cites *Dixon v. Certainteed Corp.*, 944 F. Supp. 1501, 1507 (D. Kan. 1996), for "[u]nder Kansas law, 'the phrase "arising out of" . . . imparts a more liberal concept of causation than "proximate cause."'" (quoting and citing *Pestock v. State Farm Automobile Ins. Co.*, 9 Kan. APp. 2d 188, 674 P.2d 1062, 1064 (1984); *see also, McIntosh v. Scottsdale Ins. Co.*, 992 F.2d 251 (10th Cir. 1993)).  *Dixon* and *Pestock* were concerned only with interpreting the phrase, "arising out of."  In *McIntosh*, the court found the phrase, "arising out of," to be ambiguous.  None of these cases included the interpretation of the particular phrase here that expressly limited the Contractor's duty to indemnify "to the extent caused by any negligent act or omission."  The court finds no ambiguity in this limiting provision.

wrongdoers" under K.S.A. 60-258a and under this system, "[t]he nature of misconduct . . . is to be expressed on the basis of degrees of comparative fault or causation." *Reynolds v. Kansas Dept. of Transp.*, 273 Kan. 261, 268-69, 43 P.3d 799 (2002). The indemnification phrase, "to the extent caused by," seems to match up with comparative fault language.

To prove a negligence claim, the claimant must show a duty to exist, the breach of that duty, an injury, and a causal connection between the duty breached and the injury. *Reynolds*, 273 Kan. 261, Syl. ¶ 1. Whether a duty exists is a question of law, and whether the duty has been breached is a question of fact. *Wrinkle v. Norman*, 44 Kan.App.2d 950, 953-954, 242 P.3d 1216, 1220 (2010). The Kansas Supreme Court recently quoted the following as the plaintiff's burden of proof on causation:

> "The plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant. Where the conclusion is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn....
>
> "The plaintiff is not, however, required to prove the case beyond a reasonable doubt. The plaintiff need not [negate] entirely the possibility that the defendant's conduct was not a cause, and it is enough to introduce evidence from which reasonable persons may conclude that it is more probable that the event was caused by the defendant than that it was not. The fact of causation is incapable of mathematical proof, since no one can say with absolute certainty what would have occurred if the defendant had acted otherwise. Proof of

what we call the relation of cause and effect, that of necessary antecedent and inevitable consequence, can be nothing more than 'the projection of our habit of expecting certain consequents to follow certain antecedents merely because we had observed these sequences on previous occasions.' If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists."

*Yount v. Deibert*, 282 Kan. 619, 628-29, 147 P.3d 1065 (2006) (quoting

*Prosser & Keeton on Torts* § 41, pp. 269-70 (5th ed. 1984)).

WCK comes forward with evidence of Dwire's negligence in piling excavated materials on the adjacent landfill slope and in creating this wall of excavated materials nearly eight feet high instead of hauling the materials to the stockpile.  WCK also cites an OSHA regulation that requires adequate protection for employees "from loose rock or soil that could pose a hazard by falling or rolling from an excavation face."  29 C.F.R. § 1926.651.  WCK asserts Dwire was negligent in not providing any protective system to protect workers from material rolling off the high wall of excavated material that it had created.  Dwire did not warn WCK about the unstable nature of the wall.  WCK contends that Dwire knew or should have known that WCK's employees would be working to repair the liner damage and to complete the work required under the contract.  WCK maintains there is no dispute that the boulder was dislodged from the high-wall created by Dwire and that no one else worked on the wall after Dwire left and before the injury happened.

Randy Boehmke, the district manager of WCK's Plumb Thicket

Landfill, testified in this deposition that he was responsible for safety at the

landfill and that he did not think Dwire had been performing its work in an

unsafe manner.  (Dk. 99-1, Dep. p. 29).  But Boehmke also thought that

Dwire had left the site in unsafe and dangerous condition, because the dirt

had been stacked up and there was liner work still remaining.  (Dk. 102, Ex.

F, Dep. p. 36).[11]  In his declaration, Boehmke further opined:

> 13. . . . The high-wall created by Dwire presented an unsafe condition
> due to the angle of the excavation and all the material that was
> improperly piled up because the employees had to go upslope (e.g., on
> the back side of the rain flap) to remove the material and to uncover
> undamaged lining material to complete the tie-in.  Finally, we had to
> resolve the potential safety issues created by Dwire by adequately
> planning the work and ensuring adequate spacing between equipment
> on the slope and employees working in the new cell.

(Dk. 102, Boehmke Decl., ¶ 13).  Boehmke's testimony and declaration

sufficiently create questions of material fact over Dwire's breach of its duty

of excavating and maintaining protection for others on site from rolling and

falling rock.[12]

　　　　The summary judgment record affords a reasonable basis for

---

[11]This certainly creates a serious issue of WCK's comparative fault in
sending its own employees to work under these conditions without first
creating some protection or moving the piled material.

[12]The court is here discussing Dwire's duty in general terms without
considering how that duty may have been shaped by the circumstances of
the contract's sudden termination and the subsequent questions of
foreseeability that could be related to those circumstances.  The parties have
not provided sufficient briefing on these issues so that the court could rule
on them.  In particular, the parties have not addressed whether Dwire left
the site expecting that it was ready for laborers to work in the cell.

concluding that it is more likely than not that Dwire's wall of excavated material without protective barriers was a cause in fact of the result. The photographs submitted with WCK's response evidence the condition of the site near the time of the injury making it possible for a factfinder to draw reasonable inferences that the rock rolled from excavated material left by Dwire. WCK has come forward with evidence that prior to the injury it had not disturbed Dwire's pile of excavation materials in this same general area. As for intervening weather, the parties offer no evidence of the actual weather conditions and do not analyze what impact such evidence would have in determining the issue of foreseeable risk. The court is satisfied that WCK's evidence suffices in taking the issue of causation out of the realm of mere possibility, pure speculation or conjecture. Dwire's motion for partial summary judgment is denied.

**DWIRE'S MOTION TO SEVER WCK'S COUNTERCLAIMS IN NEGLIGENCE (Dk. 67)**

Dwire seeks to sever the trial of WCK's negligence counterclaim pursuant to Fed. R. Civ. P. 21 arguing it "rests upon an entirely different set of facts separate and apart from the parties' contractual dispute." (Dk. 68, p. 2). Dwire notes the general differences between tort and contract claims in elements to be proved and damages to be recovered. Dwire observes other difficulties in readying its defense to this counterclaim and in presenting it alongside the other evidence at trial.

Rule 21 of the Federal Rules of Civil Procedure empowers a district court to "sever any claim against a party" in the exercise of its sound discretion. *K-B Trucking Co. v. Riss Intern. Corp.*, 763 F.2d 1148, 1153 (10th Cir.1985). "Rule 21 applies when the claims asserted do not arise out of the same transaction or occurrence or do not present some common question of law or fact." *Tab Exp. Intern. v. Aviation Simulation Technology*, 215 F.R.D. 621, 623 (D. Kan. 2003) (citing *See American Fidelity Fire Ins. Co. v. Construcciones Werl, Inc.*, 407 F. Supp. 164, 190 (D.V.I. 1975)). The court also may "sever unrelated claims and afford them separate treatment when to do so would be in the interest of some of the parties." *Id.* The court is guided by what "will serve the ends of justice and further the prompt and efficient disposition of litigation." *Id.* In making this determination, a "'court considers the convenience of the parties, avoiding prejudice, promoting expedition and economy, and the separability of law and logic.'" *Tab Exp. Intern.*, 215 F.R.D. at 623 (quoting *Old Colony Ventures I, Inc. SMWNPF Holdings, Inc.*, 918 F. Supp. 343, 350 (D. Kan. 1996)).

The court summarily denies this motion. WCK's counterclaims regarding the employee's injury sounds both in tort and contract, and the parties have completed discovery on these counterclaims that were submitted to the court on a partial summary judgment motion. In denying that motion, the court learned that a trial of these counterclaims would

necessarily include as background evidence the parties' performances and disputes under the contract as covered and presented in the other claims. For example, Dwire's handling of the excavated material will be a common issue of fact with overlapping evidence, as will the parties' termination of the contract and the circumstances surrounding it.  The complexity of the negligence counterclaims is not such as to create prejudicial confusion. Economy and efficiency would be served in trying all these claims in one proceeding.  Dwire's motion to sever is denied.

IT IS THEREFORE ORDERED that WCK's motion for partial summary judgment on liability against certain claims of Dwire is granted in part, in particular, Dwire's breach of contract claims for time and material billing for removal of water and mud from the excavation site and for extra rain flap work and Dwire's claims for promissory estoppel and unjust enrichment, and is denied in all other parts (Dk. 55);

IT IS FURTHER ORDERED that Dwire's motion to sever WCK's counterclaims in negligence (Dk. 67), WCK's motion for partial summary judgment on its counterclaims (Dk. 96) and Dwire's motion for partial summary judgment on WCK's counterclaims (Dk. 98) are denied.

Dated this 18th day of July, 2011, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge